BRUECKNER v. JONES.

[No. 1267A104. Filed February 24, 1970. Rehearing denied May 7, 1970. Transfer denied September 29, 1970.]

*John R. Dollens,* of Scottsburg, for appellant.

*George Gossman, Ralph Hamill, John Price, Gossman &*
*Gossman,* of Seymour, and *Hamill & Price,* of counsel, of
Indianapolis, for appellee.

SHARP, J.—This action was commenced by the Plaintiff-
Appellee, Hilda Jones, against the Defendant-Appellant,
Robert M. Brueckner, for personal injury damages under
the Indiana Guest Statute, Burns' Indiana Statutes Annotated,
§ 47-1021. The case was tried by a special judge without a
jury, resulting in a $20,000.00 judgment for the Plaintiff-
Appellee. Appellant's Motion for a New Trial was overruled
and this appeal resulted.

We must examine the factual record with all inferences in
favor of the Appellee's judgment. The essential facts are
that Appellee and her husband had been taken to Louisville,
Kentucky, by the Appellant on December 8, 1963. The purpose
of the trip was to get the Appellee's husband admitted in
the Veterans Hospital. On the afternoon in question the
Appellant was driving his automobile on its return trip from
Louisville, Kentucky, to Vallonia, in Jackson County, Indiana.
There is no dispute as to the status of Appellee as a guest of
the Appellant. The day was cloudy. As they got closer to
Vallonia it was snowing heavily. The accident in question
occurred about six miles north of Salem, Indiana, on Indiana
State Road 135, which is a hilly, winding road. At the place
of the accident the visibility was so limited as to obscure the
path of the road. The automobile driven by Appellant skidded
sidewise over the centerline of the road and collided with
another automobile. The estimates of the speed of the Ap-

pellant's car just before the accident ranged from 35 to 40 miles per hour. There is no evidence that the Appellee or her husband ever protested or objected in any manner to the way in which Appellant drove from Louisville to the point of collision. The collision occurred just south of Kossuth, Indiana, where Indiana State Road 135 has a slight incline of about 2% The Appellant's automobile weighed 2100-2200 pounds and had good tires. The road at the point of collision was 22 feet wide and asphalt. The Appellant's car had "fishtailed" four or five times between Pekin, Indiana, and the point of collision. Carl Jones, husband of Appellee, testified:

"Q. Now, after the snow had started to fall and covered the roadway, and it became slick as you testified, are you able to tell the Court what speed the defendant was driving the automobile in which you and your wife was riding.

A. 35-40 miles an hour.

Q. And will you describe the way the car travelled and progressed on the highway?

A. Well yes, the back end was what you call 'fishtailing' wheels spinning.

\* \* \*

Q. What did you say the car was doing?

A. Well, the back end was sliding back and forth. I call it 'fishtailing' and the wheels was spinning ever so often.

\* \* \*

Q. Where was you with reference to Pekin or Salem when you first noticed the car slipping and 'fishtailing' as you heretofore described?

A. I'd say 4 miles northwest of Pekin.

\* \* \*

Q. Now from that point on, tell the Court whether or not the defendant continued to drive at the speed that you testified to?

A. After it quit snowing, before we came into Salem, he picked up speed.

\* \* \*

Q. What speed would you say that he was driving immediately before he reached the southern limits of Salem?

A. 55-60 miles an hour.

\* \* \*

Q. Yes. Now as you went north from Salem, describe the condition of the weather at that time.

A. It still wasn't snowing when we was in Salem. We had just left the city limits when it started snowing again, and it continued to get heavier and heavier.

\* \* \*

Q. And then describe the speed at which the defendant drove as he went north of Salem.

A. Well, he continued to drive between 50 and 55. I'd say until the snow got heavier and heavier and he slowed down to 35 to 40.

Q. And where did he slow down to that speed, if you know?

A. Two miles, something like that, I'd say.

Q. Two miles out of Salem?

A. Two miles and a half.

Q. Will you describe the motion of the automobile at that time as to how it was acting?

A. Well, as the snow got heavier the car kept sliding back and fourth—the back end.

\* \* \*

Q. And after you had passed the car that pulled off to the side of the road, what did the defendant do with reference to the speed of the vehicle in which he was driving?

A. Well, he picked up speed again.

Q. And what speed did he gain or maintain after he passed this vehicle?

A. Somewhere between 35 and 40.

Q. And what was the condition or the way that the automobile was traveling—describe it.

A. It was slipping and sliding.

Q. And then after that, did you finally reach a point about six miles north of Salem? I say did you finally arrive at a point about six miles north of Salem?

A. Yes, approximately that.

Q. And tell the Court what happened at that point, if you will.

A. We got to six miles north of Salem and the back end seemed to start sliding worse and worse and I was looking out trying to find where the road was. I couldn't see the side of the road. I couldn't see the middle of the road and all of a sudden Reverend Brueckner made the remark that, 'Here we go,' and the car just slid sideways.

\* \* \*

Q. Well, when it slid down the road, what position was the car in?

A. It was broadside going down.

Q. And then what occurred?

A. Well, I started looking around to see where my wife was, and when I did I see car lights coming meeting us, and just right then this other car hit us.

Q. You came together with the car?

A. Yes.

Q. And this car that your car, or the car in which you were riding struck, what was its position on the roadway? I mean which way was it going?

A. The car we hit was going south.

Carl Jones, husband of appellee, upon cross-examination being questioned by Mr. Dollens:

Q. Now tell me, Mr. Jones, did the car fishtail immediately prior to the collision?

A. Yes, it did.

Q. In what direction?

A. We were going north and the back end of the car fishtailed around.

Q. The fishtail, however, was a part of the entire collision, was it not?

A. Well, the back end slid around to the right.

Q. The windshield wipers were on?

A. Yes."

Carl Jones, husband of appellee, being recalled upon direct examination, being questioned by Mr. Gossman:

"Q. Are you the same Carl Jones that heretofore testified in this cause concerning a collision between the automobile in which you were riding and an automobile driven by John Lee LaMar, which occurred on December 8, 1963, approximately 6 miles north of the town of Salem, in Washington County, Indiana?

A. Yes, I am.

Q. And am I correct in recalling that your testimony at this prior time was the vehicle being driven by the defendant on that day on Indiana 135, north of Salem, was traveling at a speed of approximately 35-40 miles per hour?

A. Yes.

Q. I ask you now to tell the Court how you arrived at this statement as to speed of the vehicle in which you were riding?

A. I had the occasion to glance at the speedometer once in a while to see approximately how fast we were going on that slick road.

Q. And immediately before this collision, did you have occasion to look at the speedometer?

A. I did.

Q. Will you tell the Court what the speedometer was registering at the time you last looked at it?

\* \* \*

Q. Tell the Court what the speedometer was indicating at that time?

A. It was between 35 and 40."

\* \* \*

Hilda Jones, Appellee, testified:

"Q. And can you tell the Court about when the snow started to fall?

A. It was close to Pekin, I don't know how close. And it snowed heavy for a short time, and we slid then a couple of times. And then it quit snowing.

\* \* \*

Q. Would you be able to say the approximate speed the defendant drove the car as he traveled from Pekin to Salem on that snowy road?

A. It was around 55 or 60, something like that.

\* \* \*

Q. What did the car do, if anything?

A. When we went into that first snowstorm at Pekin, we slipped, but we didn't meet any other cars.

\* \* \*

Q. Did the car slide more than once?

A. Yes.

\* \* \*

Q. Just describe what the car was doing?

A. Just going like that. I'd say about four or five times.

\* \* \*

Q. They want you to describe the motion of your hands. What part of the car was sliding?

A. The back, I guess.

\* \* \*

Q. What were the conditions of the weather as you reached the north edge of Salem?

A. It wasn't snowing then, it was dark.

\* \* \*

Q. What would you say about the snow as to whether it was a light snow, a heavy snow or a medium snow?

A. It was heavy.

Q. Heavy snow. Was it covering the surface of the roadway?

A. Yes.

Q. Can you tell the Court what speed Brueckner drove after he left Salem going north, approximately?

A. Well, I'd say 35, anyway.

Q. And will you describe to the Court how the car was moving at that time?

A. We were sliding back and forth.

Q. Well, could you give us some idea—about how fast probably you was traveling?

A. I'd still say between 35 and maybe more.

Q. 35 miles an hour and maybe more?

A. Yes.

Q. Was the car still sliding back and forth on the road?

A. Yes.

\* \* \*

Q. Just saw the lights of it. Will you describe what occurred just before the cars struck that you remember?

A. We were sliding and the last thing I remember is seeing the car lights, and I don't remember hitting or anything."

Hilda Jones, the appellee, upon resumption of her direct examination, being questioned by Mr. Gossman:

"Q. Now will you describe for the Court the course that the vehicle that you was riding in took in the—in traveling into the collision that you've heretofore testified about.

A. There was a heavy snow and the road was slick and we started sliding."

\* \* \*

The Appellant was concerned about reaching his home within 20 minutes from Salem.

The basic contention of the Appellant is that all of the facts and inferences fail to constitute wilful or wanton misconduct within the meaning of the Guest Statute. We agree.

In an early landmark case under the Guest Statute, *Bedwell* v. *DeBolt,* 221 Ind. 600, 605, 50 N. E. 2d 875, 877 (1943), a unanimous Supreme Court, speaking through Judge Shake, stated:

"The original 'Guest Statute' of this state provided that no guest should have a right of action against the owner or operator of a motor vehicle, unless the accident 'shall have been intentional on the part of such owner or operator or caused by his reckless disregard of the rights of others.' Acts 1929, Ch. 201, p. 679. That act was construed as relieving owners and operators from liability caused merely by failure to exercise ordinary care. *Coconower* v. *Stoddard,* 1933, 96 Ind. App. 287, 182 N. E. 466. The present act amended the act of 1929 to read as follows: 'The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in or upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or wilful misconduct of such operator, owner, or person responsible for the opera-

tion of such motor vehicle.' Acts 1937, Ch. 259, § 47-1021, Burns' 1940 Replacement, § 11265, Baldwin's Supp. 1937.

The question then arises as to the meaning of the words 'wanton and wilful misconduct,' as used in the above act. On this phase of the case we find ourselves in complete agreement with what was said by Blessing, C.J., when this case was before the Appellate Court of Indiana (47 N. E. 2d 176). We, therefore, adopt as our own the following language employed by him:

Blashfield has defined 'wanton misconduct' as the intentional or wanton disregard of the safety of others, and is manifested by conduct which is of such a character as to indicate the autoist's indifference to the consequences to his acts.' The same author defines 'wilful misconduct' as the intentional doing of something which should not be done, or intentional failure to do something which should be done, in the operation of the automobile, under circumstances tending to disclose the operator's knowledge, express or implied, that an injury to the guest will be a probable result of such conduct.' Blashfield, Cyclopedia of Automobile Law and Practice, Permanent Edition, vol. 4, § 2322, pp. 109, 110.

Berry, in his work, defines 'wanton conduct' as follows: 'Wantonness * * * is the conscious doing of some act or the omission of some duty with knowledge of existing conditions, and conscious that, from the act or omission, injury will likely result to another.' Berry, Automobiles, Seventh Ed., Section 2.340. There would seem to be little, if any, difference in the definition of 'wantonness' by Berry and the definition of 'wilfulness' by Blashfield. While the word 'wilful' may be used, in a broader sense than the term 'wanton,' we are of the opinion that the meaning of the two words, as used in the Guest Statute, is closely synonymous.

In determining what constitutes a 'wilful' or 'wanton' act, we subscribe to the view that it is not necessary to prove that defendant deliberately intended to injure the plaintiff; it being sufficient if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequences of his act was injury to the plaintiff. *Baines* v. *Collins*, 1942, 310 Mass. 523, 38 N. E. 2d 626, 138 A.L.R. 1123. See also, the Restatement of Law on Torts, § 500, page 1293. And further, acts such as exhibit a conscious indifference to consequences, make a case of constructive or legal willfulness. *Kahan* v.

*Wecksler*, 1938, 104 Ind. App. 673, 12 N.E. 2d 998; *Jeneary* v. *Chicago & I, Traction Co.*, 1923, 306 Ill. 392, 138 N. E. 203, 206; *Reell* v. *Central Illinois Electric & Gas Co.*, 1942, 317 Ill. App. 106, 45 N. E. 2d 500. To hold one guilty of 'wilful' or 'wanton' conduct, it must be shown that he was conscious of his conduct and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries."

A year later the same court stated in *Hoesel* v. *Cain*, 222 Ind. 330, 337, 53 N. E. 2d 165, 168 (1944) :

"Between ordinary negligence and wilfulness there is no middle ground. A wanton injury is in the same class with a wilful injury. The first Guest Act, ch. 201, Acts 1929, exempted the driver from liability to his guest 'unless such accident shall have been intentional upon the part of such * * * operator or caused by his reckless disregard of the rights of others.' Even this language was construed as relieving from liability except 'under circumstances when his action, or his failure to act, evinces an entire abandonment of any acre, and a heedless indifference to results which may follow, and he recklessly takes the chance of an accident happening without intent that any occur.' *Coconower* v. *Stoddard*, 1932, 96 Ind. App. 287, 296, 182 N. E. 466, 470. To justify recovery against Hoesel there must have been more than a failure to apprehend the danger of driving into the wrong lane of traffic. That was mere negligence. To have been guilty either of wilful or wanton misconduct he must have intentionally proceeded with knowledge of the peril or his conduct must have shown a conscious indifference upon his part as to whether or not his act would cause injury."

At the same period Judge Flanagan, speaking for this court in *Swinney* v. *Roler*, 113 Ind. App. 367, 373, 47 N. E. 2d 846, 848 (1943) stated:

"He made a mistake of judgment which might support a charge of negligence but not one of wanton or wilful misconduct. The situation was evidently one where such a mistake of judgment was possible, for appellee seems to have made the same mistake. For though he saw the Conwell car at all times he made no observation concerning an

approaching hazard from the time appellant's car was 200 yards from the intersection until the collision occurred. Conwell testified that he did slow down and then speed up. There is no evidence that appellant proceeded with knowledge that injury would probably result. We must conclude that the evidence most favorable to appellee is not sufficient to submit to the jury the question as to whether appellant was guilty of wanton or wilful misconduct."

For other cases consistent with the above authorities, see *Roop* v. *Woods*, 134 Ind. App. 88, 186 N. E. 2d 439 (1962); *Stillwell* v. *Adams*, 135 Ind. App. 495, 193 N. E. 2d 74 (1963), transfer denied 244 Ind. 608, 194 N. E. 2d 806; *Shane* v. *Fields*, 135 Ind. App. 353, 190 N. E. 2d 195 (1963); *Richey* v. *Sheaks*, 141 Ind. App. 423, 228 N. E. 2d 429 (1967); *Sparks* v. *Baldwin*, 137 Ind. App. 64, 205 N. E. 2d 173 (1965); *Wyatt* v. *Thompson*, 132 Ind. App. 261, 175 N. E. 2d 44 (1961); *Reynolds* v. *Langford*, 241 Ind. 431, 172 N. E. 2d 867 (1961); and *Barbee* v. *Frick*, 139 Ind. App. 43, 205 N. E. 2d 180 (1965).

The last work on the subject of wilful or wanton misconduct from our Supreme Court is found in *Tuttle* v. *Reid*, 247 Ind. 375, 377, 216 N. E. 2d 34, 35 (1966), in which the trial court had entered a directed verdict for the Defendant-Appellee. In affirming the court stated:

"Evidence most favorable to appellees is as follows: Appellant's wife, Mary S. Tuttle, was riding in the front seat of a four-door hardtop automobile with appellee, Marjorie Mary Reid, who was the driver. One Mary Frances Kern was sitting in the middle and next to Mary S. Tuttle who was on the right of the seat. The three of them were going to a bridge-luncheon being given by a mutual friend. It was about 1:00 p.m. on January 16, 1959. The day was cold, but there was no snow, ice or water on the road. They were proceeding north on Spring Mill Road, which is a straight north-south, two-lane paved road. Seventy-third Street runs east and west and crosses it.

As they approached the intersection at 73rd Street, appellee Grant was driving his motor vehicle in an eastward direction on 73rd Street. This street was a preferential highway, while Spring Mill Road was not. There was a stop sign a

few feet south of 73rd on the right-hand (east) side of Spring Mill Road. As appellee Reid approached the intersection, she did not slow up. Mrs. Kern called out a warning to the effect that there was a car and a stop sign. A Deputy Sheriff said that at the scene of the accident, Mrs. Reid gave the explanation that they were all laughing and talking, and she saw the stop sign after it was too late. Appellee Grant sounded his horn and attempted to apply his brakes, but appellee Reid had entered the intersection without stopping saying: 'If I speed up, do you think I can beat it?' She attempted to accelerate, but the collision took place immediately.

The evidence is uncontradicted that appellee Reid was unaware of the stop sign until the warning was given by Mrs. Kern as they were passing a house on the southeast corner of the intersection. At the time, appellee Reid was traveling at a speed of approximately forty miles per hour, which was ten miles per hour over the speed limit which was thirty miles per hour. As a result, the evidence shows that it was impossible for her to stop at the stop sign, and she had a very short time to act when she became aware of the peril.

Appellant's wife suffered severe injuries because of the accident, and her husband, appellant herein, sued for loss of services.

Appellant may recover for his wife's injuries against appellee Reid only if the above facts are sufficient to warrant a finding that she was guilty of 'wanton or wilful' misconduct under the Indiana Guest Statute, which reads as follows:

'The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in or upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or wilful misconduct of such operator, owner, or person responsible for the operation of such motor vehicle.' Burns' Ind. Stat., 1965 Replacement, § 47-1021.

The action taken by the trial court in directing a verdict favorable to Mrs. Reid was proper only if all the evidence favorable to appellant and all the inferences which reasonably might have been drawn therefrom were not sufficient to establish wilful or wanton misconduct on the part of appellee Reid. Under these circumstances, a trial court

may properly give a peremptory instruction to find for the defendant. *Reynolds, Admx., etc.* v. *Langford* (1961), 241 Ind. 431, 172 N. E. 2d 867.

Here there was no conflict in the evidence. There seems to be a question that appellee Reid may have been careless and negligent in the operation of her automobile at the intersection where the collision occurred. But does this mean that she could be held liable under the terms of the Guest Statute? In regard to 'wanton and wilful' misconduct on the part of the operator of a motor vehicle, this court has said as follows:

'Accordingly, the foregoing decisions are consistent with the proposition that the misconduct of a host driver, in order to bring it within the purview of the guest statute (§ 47-1021), *supra*, must be committed while the driver is possessed of a mental attitude with respect to both his driving and his guest, which is adverse to the welfare of his guest. This mental attitude is necessary if the conduct of the operator is to be described as being 'wanton or wilful' misconduct.

\* \* \*

As stated \* \* \* in the concurring opinion of *Brown* v. *Saucerman, supra,* (237 Ind. 598, at page 619) ;

'To be guilty of *wanton* misconduct within the meaning of the statute (§ 47-1021, *supra*), the driver must (1) be conscious of his misconduct; (2) be motivated by a desire to assert himself or his interests above or beyond, or in reckless indifference for, the safety of his guest, and (3) he must do so knowing that his conduct subjects them to a \* \* \* probability of injury.' (Our italics.) *Clouse, etc.* v. *Peden* (1962), 243 Ind. 390, 396, 397, 186 N. E. 2d 1, 3, 4.

And as said in *Reynolds, Admx., etc.* v. *Langford, supra,* at pages 438, 439 of 241 Ind., at pages 870 of 172 N. E. 2d, as follows:

'The rule as to what is necessary to show 'wilful or wanton' misconduct is succinctly stated in *Bedwell* v. *DeBolt,* supra (1943), 221 Ind. 600, at page 607, 50 N. E. 2d 875, as follows:

'To hold one guilty of "wilful" or "wanton" conduct, it must be shown that he was conscious of his conduct and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries.'

In *Sausaman* v. *Leininger* (1958), 237 Ind. 508, 514, 146 N. E. 2d 414, 418, this court added,

"We concur in the fact that to constitute 'wilful or wanton misconduct' there must be a 'perverse motive,' in that the misconduct must be conscious and intentional and of such a nature that under the known existing conditions injury will probably result therefrom.'

*In the present case there is a total lack of evidence as to any mental attitude on the part of the driver which was adverse to the welfare of the guest or which might be considered as a 'perverse motive' in this the misconduct was conscious and intentional, and that the driver under the known circumstances knew that injury would probably result therefrom.* The statement made by appellee Reid: 'If I speed up, do you think I can beat it?', if it tends to prove anything, only tends to prove that she was concerned with the welfare of herself and guests in connection with the consequences of her action." (our emphasis)

Since 1937 the Indiana Supreme and Appellate Courts have laid down certain guidelines for the lower courts to follow in evaluating guest cases. An examination of these authorities indicates:

a. An error of judgment or a mistake standing alone, on the part of the host, will not amount to wanton or wilful misconduct.

b. The host must have manifested an attitude adverse to the guest, or of "perverseness", in that the host must have shown he was indifferent to the consequences of his conduct.

c. The entire course of conduct of the host leading up to the accident must be considered.

d. The host must have had actual knowledge of danger confronting the guest.

The Appellee relies almost entirely on the case of *Clouse* v. *Peden,* 243 Ind. 390, 396, 186 N. E. 2d 1, 3 (1962). However, in *Clouse* our Supreme Court stated:

"Accordingly, the foregoing decisions are consistent with the proposition that the misconduct of a host driver, in order to bring it within the purview of the guest statute

(§ 47-1021), *supra*, must be committed while the driver is possessed of a mental attitude with respect to both his driving and his guest, which is adverse to the welfare of his guest. This mental attitude is necessary if the conduct of the operator is to be described as being either 'wanton or wilful' misconduct."

*Clouse* is also factually dissimilar to this case. In it the speed was 75 to 80 miles per hour at the unmarked intersection of two gravel county roads where vision was obstructed. There were stop signs. *The driver in Clouse was seeing how fast the car would run. The guest in Clouse had asked the driver to slow down and reminded the driver of a prior accident at the same intersection. The guest continued to plead with the driver to slow down. The driver approached the intersection without applying his brakes.*

A mere recital of the above facts from *Clouse* shown a fundamentally different situation than in this case. It shows the existence of the mental attitude missing in the *Tuttle* case. *There is a total lack of such evidence in this case.*

To adopt the Appellee's position in this case would, in effect, repeal wilful or wanton misconduct as the basis for the Indiana Guest Statute. While this may be a desirable result it must be accomplished through the legislative rather than judicial processes.

Based on the above cited Indiana authorities the decision of the trial court is contrary to law and this cause is therefore reversed with instructions to grant Appellant's Motion for a New Trial.

Reversed. Costs v. Appellees.

Hoffman, P.J., Pfaff and White, JJ., concur.

NOTE.—Reported in 255 N. E. 535.