CAROLYN DENISE TUTTERROW v. WILLIAM D. BROOKSHIRE.

[No. 1271A261. Filed June 22, 1972. Rehearing denied July 26, 1972.]

472

*Martin K. Edwards, Malcolm M. Edwards*, Edwards, Edwards & Edwards, of New Castle, for appellant.

*James R. White*, New Castle, for appellee.

LOWDERMILK, J.—This appeal comes to us from an adverse finding by a jury in a guest case in which the jury awarded damages to the father of the deceased child, a boy twelve years of age, in the sum of $17,000.00.

Defendant-appellant's brief might well be defined as a re-hash of the evidence of the case, as some of it is stated as many as three times.

Her motion to correct errors is also several pages long, which, again, is a re-hash of the evidence by way of argument. Defendant-appellant sets out in her brief three issues for review on which she claims error, which, of the first two, neither is supported by citation of authorities and statutes, as required by Rule AP. 8.3(A)(7).

We feel that specification number 3 is worthy of being considered by this court, and we shall consider the same.

Specification 3 reads as follows, to-wit:

"The verdict of the jury is against the weight of the evidence and is not supported by sufficient evidence on the question of wanton or wilful misconduct and is contrary to law."

It must be noted that in the motion to correct error, there was mention made that the verdict was not supported by sufficient evidence but there was no contention that it was contrary to law. However, if the verdict was not truly sustained by sufficient evidence on the question of wanton and willful misconduct, then it would necessarily be contrary to law.

The facts are that Carolyn Denise Tutterrow, defendant-appellant, was 16 years of age in August of 1968, and graduated from high school in 1970. On August 28, 1968, defendant-appellant was operating a 1963 Rambler four-door sedan automobile with the permission and authority of her father. She had had driver's education in school and on August 28, 1968, had had a driver's permit for just one month.

On said date she drove around New Castle in this automobile and ultimately picked up Marcia Owens, age 15 years, and Jerry Brookshire, age 12 years. The three of them went to pick up a tennis racket and went back to the tennis courts in New Castle, but the courts were full. Defendant-appellant did not stay there, but drove to a soft drink place in New Castle and from there went out in the country to Road 275. This was a paved road out a part of the way and then Road 275 was a gravel road, 19 feet wide in the widest spots and with narrow spaces, and the road had a number of hills and hollows, with a roller-coaster effect, and was called the "7 Hills Road."

A registered land surveyor surveyed this road and found it to be, at the first incline near Road 250 south, 6 feet higher than the first depression. It was 250 feet from the valley to the top.

The next depression was at Station 19, with the top of the incline to the south (Station 17) being 9½ feet higher than the depression. This distance is 187.5 feet.

The next depression is Station 15. The top of the incline to the south (Station 13) is 6 feet higher than the depression. (The distance from Station 15 to Station 13 is 187.5 feet.)

The surveyor witness testified that he was 6' 1" tall and could not see over these hills and see the roadway ahead of him while standing at the bottom of a depression. It was said that each of the hills was rather steep.

Defendant-appellant was driving south on said Road 275, which was gravel, and which gravel was loose all over the

road but piled higher in the center. She was driving at speeds from 55 to 70 miles per hour on this gravel road, with Marcia Owens riding in the middle and Jerry Brookshire riding on the right side of the front seat when she topped a hill designated as Station 8:50 to the southwest. Her car skidded to the left as it was going down the hill, was sliding a little bit, fishtailing, not wildly, just fishtailing all the way down the hill. This was seen by Doug Polk, who at that time was 17 years of age and standing on the draw-bar of a tractor where he was baling hay in the field east of Station 9. This witness saw lots of gravel flying up; he then saw the car moving toward him in a little sideways motion. He next saw the dust blow up real hard and the car went the other way, right straight across the road. He next saw the wheels coming up but didn't know what happened to the car.

He testified the speed of the car when it first came up over the hill was at least 70 miles per hour. However, he could only see the car to make the estimate of the speed as it passed in breaks between trees and brush on the highway.

Defendant-appellant was asked why they were there and she said "Well, you know how everybody likes to ride over the hills." In answer to the interrogation as to her speed she said "You know how fast I was going."

State trooper, Joe Harris, on the same afternoon, took photos of the car out in the field standing at the crest of the incline at Station 13 and facing the south. This photo shows where the car had gone through the fence and shows the car out in the field on its wheels, with physical damage to the hood, windshield, left door and left side showing in the picture.

Deputy sheriff Sam Ballinger testified that he was at the scene, described it, and said that defendant-appellant told him she was driving too fast, like everyone else, and that she was going about 60 miles per hour.

Defendant-appellant had driven this road several times

before. She came over the hill at the top and the car went to the left and she tried to get out of that and she turned the wheel, just barely put on the brakes, as she had been taught in driver's training not to apply the brakes as it would make a car skid more.

We are of the opinion that what she said is exactly true, but that she had misapplied her instruction and that, in all probability the instruction was as to driving under icy conditions.

This court has the right to take into consideration the things that happen in the ordinary affairs of the lives of men, as does the jury, and therefore, the jury and this court may consider the fact that it is necessary to bring a car under control and slow its speed by applying the brakes, or by hitting something; defendant-appellant admits she did not adequately apply the brakes to stop the car.

The evidence of Marcia Owens, a guest passenger, was that they had been in the car with defendant-appellant about forty-five minutes before the fatal accident.

She testified that they left the end of the pavement and were going over the hills on the gravel and that defendant-appellant, when topping one of the hills, drove over to the left and then over to her right. She thought the driver was trying to control the car; felt like they went over a little gulley and she saw something flying in the air. She was knocked out and when she woke up she was out in the field.

She testified she thought they were going to have a wreck; she looked at the speedometer a few minutes before they were off the road when they were on top of a hill. The numbers were close together when she looked and she knew the speedometer was at 60; it was juggling back and forth. It was jumping between 55, 60 or over that. The high figure she read was 70.

At this time Marcia Owens had had no driving experience

at all and had never taken driver's training and had never been on the 7 Hills Road before to her knowledge.

She did not get scared and look at the speedometer until they got on the 7 Hills Road. She did, however, become scared and couldn't say anything when they were getting ready to go down the hill. The car swerved to the left at the top of the hill at Station 13 just as they were coming to the top and it was right before they got to the top that she became scared. She was so scared at Station 13 she could not talk although she attempted to. It was here she looked at the speedometer as they were getting ready to go down that hill. At one time she saw the speedometer hand at 55 and she was only able to stare at it and open her mouth but could not utter any sound.

The appellant, in the argument section of her brief, cites the case of *Brueckner* v. *Jones* (1970), 146 Ind. App. 314, 255 N. E. 2d 535, which case extensively reviewed the Indiana cases on the subject of wanton or willful misconduct under our Guest Statute and which case granted a new trial on the grounds that the necessary mental element essential for a judgment favoring the plaintiff under our Guest Statute was missing. She further contends that the case at bar is very similar to the *Brueckner* case.

In *Brueckner,* the landmark case under the Guest Statute, *Bedwell* v. *DeBolt* (1943), 221 Ind. 600, 605, 50 N. E. 2d 875, 877, was cited as follows:

> "In an early landmark case under the Guest Statute, *Bedwell* v. *DeBolt,* 221 Ind. 600, 605, 50 N. E. 2d 875, 877 (1943), a unanmious Supreme Court, speaking through Judge Shake, stated:
>
> > " 'The original "Guest Statute" of this state provided that no guest should have a right of action against the owner or operator of a motor vehicle, unless the accident "shall have been intentional on the part of such owner or operator or caused by his reckless disregard of the rights of others." Acts 1929, Ch. 201, p. 679. That act was constructed as relieving owners and operators from liability caused merely by failure to exercise ordinary

care. *Coconower* v. *Stoddard* (1932), 96 Ind. App. 287, 182 N. E. 466. The present act amended the act of 1929 to read as follows: "The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in or upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or wilful misconduct of such operator, owner, or person responsible for the operation of such motor vehicle." Acts 1937, Ch. 259, § 47-1021, Burns' 1940 Replacement, § 11265, Baldwin's Supp. 1937.' "

In *Brueckner,* there was no conflict in the evidence. In *Brueckner,* the court said, in discussing the case of *Tuttle* v. *Reid* (1966), 247 Ind. 375, 377, 216 N. E. 2d 34, 35:

" 'Here there was no conflict in the evidence. There seems to be a question that appellee Reid may have been careless and negligent in the operation of her automobile at the intersection where the collision occurred. But does this mean that she could be held liable under the terms of the Guest Statute? In regard to "wanton and wilful" misconduct on the part of the operator of a motor vehicle, this court has said as follows:

" ' "Accordingly, the foregoing decisions are consistent with the proposition that the misconduct of a host driver, in order to bring it within the purview of the guest statute (§ 47-1021), *supra,* must be committed while the driver is possessed of a mental attitude with respect to both his driving and his guest, which is adverse to the welfare of his guest. This mental attitude is necessary if the conduct of the operator is to be described as being either 'wanton or wilful' misconduct." ' "

Our Indiana Supreme and Appellate Courts (now Court of Appeals), for the purpose of evaluating guest cases, have laid down certain guidelines for the trial courts to follow in such evaluation. The authorities indicate that these guidelines are as follows:

"a.  An error of judgment or a mistake standing alone, on the part of the host, will not amount to wanton or wilful misconduct.

"b.   The host must have manifested an attitude adverse to the guest, or of 'perverseness', in that the host must have shown he was indifferent to the consequences of his conduct.

"c.   The entire course of conduct of the host leading up to the accident must be considered.

"d.   The host must have had actual knowledge of danger confronting the guest."

Defendant-appellant in her brief contends that the latest case under the Guest Statute is *Fuller* v. *Wiles* (1972), 151 Ind. App. 417, 280 N. E. 2d 59, 29 Ind. Dec. 664. This case cites *Brueckner* v. *Jones, supra, Clouse* v. *Peden* (1962), 243 Ind. 390, 186 N. E. 2d 1, *Cheek* v. *Hamlin* (1972), 150 Ind. App. 681, 277 N. E. 2d 620, 29 Ind. Dec. 16, *Mazza* v. *Kelly* (1970), 147 Ind. App. 33, 258 N. E. 2d 171, *Tuttle* v. *Reid, supra,* and *Mamula* v. *Ford Motor Co.* (1971), 150 Ind. App. 179, 275 N. E. 2d 849.

Having reviewed all these cases we are of the opinion that the guidelines set out in *Brueckner* v. *Jones, supra,* are still necessary and proper and must be fully complied with before a guest can make a case against the owner or operator of an automobile in which the guest was a non-paying passenger when injured.

In the case at bar the defendant-appellant was driving on a hilly gravel road nineteen feet wide at its widest place, constructed with much loose gravel over the entire road with a high place extending down the center of the road. The road had seven hills and youngsters liked to drive it because of the roller coaster effect of going over the hills. Defendant-appellant had driven the road some two or three times prior to this occasion and without mentioning where she was going, drove out and drove over this road with her two passengers, which was the first time that they had traveled or been on this road, according to the record.

Defendant-appellant was driving at a speed which the evidence shows ranged from 55 to 70 miles per hour, from a

witness in the automobile observing the speedometer, and from a disinterested witness standing out in a hay field who estimated the speed. The speedometer seemed to jump back and forth as they rode along this road.

In *Cheek* v. *Hamlin* (1972), 150 Ind. App. 681, 277 N. E. 2d 620, this court stated that Indiana has adopted the Wyoming rule, in *Meyer* v. *Culley* (1952), 69 Wyo. 285, 241 P. 2d 87:

" . . . which held that generally speed in and of itself did not constitute 'wilful mis-conduct' yet there may be a point where the speed became so excessive that the danger of injury to a guest was probable at such extreme speed and that this might constitute 'wilful mis-conduct'. The court further held that it was, needless to say, the circumstances appearing in each case that must rule this point."

In the case at bar, speed, standing alone, will not control and we cite the Wyoming rule for the purpose of clarification as to other acts which may constitute willful misconduct.

We must consider, under the four guidelines, the speed under the circumstances and all the evidence in the case.

Under "b" of the guidelines, we can find no evidence that the driver-hostess showed an indifference to the consequences of her conduct and neither did she manifest an attitude adverse to her guests, or of perverseness. The record before us discloses that there was a friendly feeling between these parties, that the defendant-appellant, driver of the host car, was merely taking her friends on what she had thought would be an enjoyable outing for the few minutes they awaited their turn on the tennis courts.

There is no evidence in the record that the defendant-appellant driver showed she was indifferent to the consequences of her conduct. In fact, the record appears to us on its face that she showed just the opposite.

Inasmuch as plaintiff-appellee failed to prove specification "b" of the guidelines, he did not make his case under the Guest Statute and we need not write on the other three

480

specifications. The same rule would apply on writing on the other three specifications as applies when there are several errors alleged in the motion to correct errors and the case is resolved on one error only. *Selner* v. *Fromm, et al.* (1969), 145 Ind. App. 378, 251 N. E. 2d 127; *Board of Commissioners* v. *Flowers* (1964), 136 Ind. App. 597, 201 N. E. 2d 571.

For the reasons heretofore stated we are of the opinion that the verdict was awarded on insufficient evidence and, therefore, is contrary to law.

Judgment reversed.

Robertson, P.J. and Lybrook, J., concur.

NOTE.—Reported in 284 N. E. 2d 87.