**Gary L. STAUFFER,**
**Defendant-Appellant,**

v.

**Daniel L. LOTHAMER,**
**Plaintiff-Appellee.**

**No. 3–1177A297.**

Court of Appeals of Indiana,
Fourth District.

April 16, 1981.
Rehearing Denied June 16, 1981.

Don W. Wyneken & Ralph R. Blume, Blume, Wyneken & Bullman, Paul C. Raver, Sr., Raver & Federoff, Fort Wayne, for defendant-appellant.

Arthur G. Surguine and Thomas C. Ewing, Hunt, Suedhoff, Borror, Eilbacher & Lee, Fort Wayne, for plaintiff-appellee.

MILLER, Judge.

The instant appeal presents a situation in which the driver of an automobile, defendant-appellant Gary L. Stauffer, contends there was insufficient evidence of "wanton or wilful misconduct" under Indiana's guest statute, Ind.Code 9–3–3–1, supporting a jury verdict in favor of his passenger, plaintiff-appellee Daniel L. Lothamer, in the amount of $59,000 for injuries which Lothamer sustained in a one-car collision which occurred in Fort Wayne, Indiana. In addition, numerous other issues are presented for our review, among them that the damages awarded were excessive, certain evidence was improperly admitted, instructions improperly given and refused, and the jury's verdict was invalid due to alleged juror coercion and statements purportedly made to jurors by the bailiff. We affirm.

The basic facts in support of the judgment entered on the jury verdict may be summarized as follows:

On June 21, 1974, after working from 11 to 13 hours that day as an apprentice electrician, Stauffer, 19 or 20, went with Lothamer, 22, who shared an apartment with him in Woodburn, Indiana, to a tavern in Ohio, where they consumed two pitchers of beer with another friend in the course of one or two hours. Each person drank approximately two to three beers. Thereafter, Stauffer and Lothamer went to their apartment where they remained until ten or eleven P.M., at which time they traveled to a second tavern, this time in Fort Wayne. Although Lothamer had been reluctant to go to Fort Wayne that evening, Stauffer had persuaded him to go to the tavern, where they drank two to three more glasses of beer (within an hour or an hour and one-half) before proceeding to another Fort Wayne tavern. In the course of several more hours of drinking by both parties, Stauffer drank approximately two or three beers. When they departed at approximately 1:15 or 2:00 in the morning, Stauffer had consumed a little more beer than had Lothamer.

After leaving the third tavern, Stauffer drove his car onto nearby Jefferson Street, which is a one-way street headed east in Fort Wayne. At that time, the streets were still wet, since it had been raining earlier in the evening. Stauffer did not recall whether he stopped at various stop-lights along the way. He stated that although he was not intoxicated as a result of the night of drinking, he was "feeling the effects" of the alcohol. In addition, Lothamer testified that before reaching Jefferson, Stauffer began yelling, gesturing and waving his fist at the driver of another car which pulled around Stauffer's vehicle, at which time Lothamer asked him to "cool it" because "I didn't want to get in no hassles."

An independent witness to the entire accident, one John McIntosh, stated that Stauffer turned onto Jefferson from a "straight-through" lane, rather than by the appropriate left-turn lane, and that when he first observed the car, both Stauffer and Lothamer were talking and laughing. According to McIntosh, Stauffer's car stopped at a red light and then, after a racing of engines, "darted across the road," spinning his rear wheels on the wet pavement and "jumping ahead in front of me." Stauffer

arrived at the next stoplight on Jefferson somewhat earlier than McIntosh and again, according to that witness, "floored it" so that McIntosh "could hear his back tires spinning." As they drove down Jefferson, Stauffer remained in the far right lane while approaching a sharp curve where the accident occurred. At that approximate point on Jefferson, there are three lanes, two of which curve sharply to the right, while the far left lane proceeds in a different direction. Lothamer testified that as they approached the curve, he asked Stauffer to slow down because the curve was bad. Stauffer's car was traveling about 55 miles per hour, while the posted speed limit in the vicinity is 35. In this regard, McIntosh stated that he reduced the speed of his own vehicle while approaching the curve behind Stauffer, because "I couldn't make it at 35 or 40 miles an hour when it ... [was] wet." McIntosh, like Stauffer, was familiar with the "mean curve."

Significantly, Lothamer testified that when he asked Stauffer to slow down, about a block before the curve, the response was that "*for a second or so he* [Stauffer] *hit the gas pedal* and then instantly after that he hit the brake." (Emphasis added.) He did not remember whether Stauffer had hit the brakes "fast or slow." Stauffer stated he had applied his brakes hard, because he believed his car would hit another vehicle (which it appears was in fact parked alongside the road.) Lothamer further stated that as they entered the curve, he grabbed the dashboard because he saw lights coming toward him,[1] and then closed his eyes.

McIntosh stated he did not see Stauffer's brake lights go on as the latter's car approached the curve. According to McIntosh, Stauffer still had control of his car when he hit a puddle of water in the curve, "but after he hit the water ... he went straight across, right through the water directly across the lanes then hit the bunkment [sic]." Stauffer's brake lights came

on when his car was in the water. McIntosh also noted the puddle of rainwater extended into the left-hand lane, where McIntosh was traveling behind Stauffer, and that the Stauffer vehicle "hit so hard the water flew over the car back onto my car." He testified, "[a]t that time he hit it harder and went over, all the way across the road into my lane and hit the curbing and therefore lost control." The Stauffer car then bounced across to the right curb and lifted off the ground two to three feet, apparently turning as it traveled in the air, and struck a utility pole on the passenger's side, where Lothamer was seated. The vehicle came to rest facing the opposite direction from which Stauffer had been driving with the utility pole on top of the car.

McIntosh approached the car after witnessing the accident, and observed that Lothamer was "jammed" in his seat and was screaming. Stauffer, who was in the back seat, was on his knees and had a pocket knife in his mouth, which he told McIntosh was a cigar. McIntosh could smell alcohol of some kind on Stauffer. Lothamer was removed from the car through the windshield after special crews were called in to separate the car from the utility pole. He suffered numerous injuries, including three fractures in his pelvis, a fractured arm, and a complete trans-section of the urethra, a life-threatening injury under the circumstances involving immediate surgery and the probability that Lothamer must regularly visit a doctor's office for urethral dilations throughout the rest of his life.

Following the accident and his subsequent hospitalizations, Lothamer initiated the instant litigation by filing his complaint on June 5, 1975 alleging damages of some $150,000—including lost income, medical expenses, and permanent physical impairment—because of Stauffer's wilful and wanton misconduct in the operation of his car resulting in the accident at issue.[2] As

---

1. These were apparently coming from another lane.

2. A second paragraph of the complaint alleging Stauffer's mere negligence in causing the accident was ultimately stricken by the court, following Stauffer's motion pursuant to Ind.Rules

noted above, a jury awarded damages of $59,000 with respect to which the trial court entered its judgment on May 11, 1977.

On appeal, the following issues are presented by Stauffer for our review:

1) There was no probative evidence to prove he acted wilfully or wantonly in driving his vehicle so as to make him liable to his passenger Lothamer under the appropriate guest statute;

2) Evidence of statements made by the witness McIntosh to the investigating police officer were improperly admitted since it was hearsay;

3) Various rulings on instructions by the trial court were in error;

4) The verdict of the jury was invalid due to alleged juror coercion and statements purportedly made to a juror by the bailiff; and

5) The damage award was excessive.

We discuss these issues *infra* in the order they were considered by the parties.

### I.

The essential substantive issue presented for our consideration by Stauffer involves the application of IC 9–3–3–1, the so-called "guest statute" which the parties agree is controlling on the facts of the instant litigation. That statute provides:

"The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in or upon such motor vehicle resulting from the operation thereof, *unless such injuries or death are caused by the wanton or wilful misconduct of such operator*, owner, or person responsible for the operation of such motor vehicle." (Emphasis added.)

According to Stauffer, the facts fail to present any probative evidence of either "wanton or wilful misconduct" supporting

of Procedure, Trial Rule 12(F) by virtue of Indiana's "guest statute," IC 9–3–3–1, quoted *infra*. Lothamer's complaint acknowledged he was a passenger in Stauffer's automobile "at the invi-

the jury's determination he is liable to Lothamer. We disagree.

■ In applying such statute, we first observe several general principles which have evolved out of the many Indiana cases in this area of the law. Initially, it is significant that a Court assessing a jury verdict on appeal appropriately looks beyond the facts and circumstances of "the immediate time and place of the accident" to consider the significance of such facts with reference to the "complete course of conduct or misconduct of the host driver preceding the accident." *Richey v. Sheaks*, (1967) 141 Ind.App. 423, 434, 228 N.E.2d 429, 435; *and see Sili v. Vinnedge*, (1979) Ind.App., 393 N.E.2d 251; *Fielitz v. Allred*, (1977) Ind.App., 364 N.E.2d 786; *Tutterrow v. Brookshire*, (1972) 152 Ind.App. 471, 284 N.E.2d 87; *Mazza v. Kelly*, (1970) 147 Ind. App. 33, 258 N.E.2d 171; and *Brueckner v. Jones*, (1970) 146 Ind.App. 314, 255 N.E.2d 535. In viewing the total circumstances, our Supreme Court has concluded with reference to an allegedly offending driver:

"To have been guilty either of wilful or wanton misconduct he must have intentionally proceeded with knowledge of the peril or his conduct must have shown a conscious indifference upon his part as to whether or not his act would cause injury."

*Hoesel v. Cain*, (1944) 222 Ind. 330, 338, 53 N.E.2d 165, 168. And in *Bedwell v. DeBolt*, (1943) 221 Ind. 600, 605, 50 N.E.2d 875, 878 the Court stated:

"In determining what constitutes a 'wilful' or 'wanton' act, we subscribe to the view that it is not necessary to prove that defendant deliberately intended to injure the plaintiff; it being sufficient if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequences of his act was injury to the plaintiff."

tation of and as the guest of the defendant." Lothamer does not appeal the dismissal of this portion of his complaint.

Thus, while a mere error in judgment or mistake does not amount to wanton or wilful misconduct, if the circumstances are such that reasonable men would conclude their conduct entails a probability of injury, the host driver is chargeable with such knowledge. *Sili v. Vinnedge, supra,* citing *Fielitz v. Allred, supra; Tutterrow v. Brookshire, supra; Mazza v. Kelly, supra* and *Brueckner v. Jones, supra.* In this regard, it has frequently been suggested "[t]he host must have manifested an attitude adverse to the guest or of 'perverseness' in that the host must have shown he was indifferent to the consequences of his conduct." *Sili v. Vinnedge, supra* at 255.

We find these requisites of "wilful or wanton misconduct" to have been met in the instant situation, when we compare the immediate evidentiary showing with the specific facts presented in other similar cases. In the recent case of *Sili v. Vinnedge, supra,* for example, this Court found there was ample evidence from which a jury could conclude the driver exhibited "wanton" misconduct based on circumstances analogous to those in the case at bar. In *Sili,* the entire course of conduct considered by the Court revealed a one and one-half to two minute car ride in which the driver, Vinnedge, left a school parking lot going "very fast" and then, after a "spinning" of wheels and a near collision with another car, made one "normal" turn, apparently accelerated, and took a subsequent curve too fast, perhaps as fast as 45 or 50 miles per hour. Once in the curve, the car struck the right curb, Vinnedge appeared to regain control, and "all of a sudden" the vehicle veered left into a tree. Significantly, the driver in that case, as in the instant situation, was familiar with the curve in question and thus "perhaps knew what speed was safe and what speed was unsafe." *Sili v. Vinnedge, supra* at 255. Despite such possible awareness, there was evidence[3]

Vinnedge may have held his speed constant "until just before impact" with the tree, thus at least suggesting such driver's "only thought was to take the curve at the fastest speed possible." *Id.* Accordingly, the Court held it was a question for the jury whether Vinnedge was conscious of his misconduct and acted with a reckless indifference of probable injury. *See also Gibson v. Estate of Holderbaum,* (1980) Ind.App., 413 N.E.2d 614, 617, where it was concluded, "the driver must bear the legal responsibility for his conscious, impulsive decision to turn left while proceeding at a high rate of speed.... The jury could infer that the defendant acted with reckless indifference for the safety of his passengers by engaging in a motorized game of hide-and-seek."[4]

We similarly believe that in the instant case, after viewing all of the evidence of Stauffer's "sportive" driving immediately preceding his effort to take the curve at as much as 55 miles per hour, a juror could reasonably conclude his apparently "impulsive" misconduct was "wanton" within the meaning of IC 9–3–3–1, *supra.* As noted above, Stauffer was admittedly feeling the effects of the alcohol he had been consuming all evening until 1 or 2 A.M. Soon before the accident he began yelling and gesturing at another driver who pulled in front of Stauffer's car, was "spinning" his rear tires, made an improper turn, and "floored it" at one stoplight as soon McIntosh approached, at least raising in inference that Stauffer was attempting to engage in a speed contest. In the course of such activities, when Stauffer was yelling and gesturing at the other driver, Lothamer asked him to "cool it." Unlike the situation in *Sili* where there had been no comment or warning to Vinnedge regarding his driving, Lothamer asked Stauffer to slow down as they approached the curve, perhaps a block before reaching it. *See Mazza v. Kelly,*

---

3. In particular, the Court noted expert testimony that some three hundred feet of "scuff marks" showed he maintained a constant speed. A witness did not see the car skid or its brake lights go on.

4. That case involved the "impulsive" decision of a teenager to turn left after spotting acquaintances driving on the opposite side of the road. The evidence also revealed skid marks resulting from the driver's efforts to stop the car before the accident.

*supra*, where the Court, in concluding a jury question was raised, emphasized the driver had ignored the warnings of passengers and cursorily dismissed them with the statement that everything would be alright. In addition, Stauffer was familiar with the curve and knew it had a tendency to collect water. *Compare Tuttle v. Reid*, (1966) 247 Ind. 375, 216 N.E.2d 34. Despite such knowledge, and while already traveling perhaps 20 miles per hour over the speed limit, Stauffer hit the gas "for a second or so" following Lothamer's warning, although there also was evidence that eventually he did apply the brakes once the car was in the water. Viewing all of these facts and the inferences therefrom, rather than simply the "immediate" circumstances of the accident itself and Stauffer's ultimate efforts to avoid injury, we do not believe it was error for the jury to conclude Stauffer's impulsive acts were wanton and outside any protections of the guest statute. *Sili v. Vinnedge, supra,* and *Gibson v. Estate of Holderbaum, supra.* As was stated in *Pierce v. Clemens*, (1943) 113 Ind.App. 65, 73, 46 N.E.2d 836, 839:

> "The question as to whether the accident was caused by the wanton or wilful misconduct of the defendant should be left to the jury in all cases where there is any conflict in the evidence or where different inferences from the testimony given might be reasonably drawn."

Accordingly, Stauffer's first assignment of error is without merit.

## II.

■ Significant to the second issue raised by Stauffer, the witness to the accident, McIntosh, testified at trial that Stauffer had been traveling "around 45 to 50" miles per hour at approximately the time the accident occurred. By way of impeachment, Stauffer then introduced evidence of a prior inconsistent written statement made by McIntosh,[5] to an unidentified investigator some four months after the accident, in which McIntosh asserted Stauffer's car was going only 30 miles per hour. In order to rehabilitate his impeached witness, Lothamer was permitted to question a police officer, Greer, regarding statements made by McIntosh at the scene of the accident which were consistent with his testimony in court. Stauffer now challenges such attempt to rehabilitate McIntosh through Greer by claiming Greer's testimony was hearsay.

In contrast to such contention, our analysis concludes the testimony objected to was not hearsay. It was not offered for the truth of what was said and the jury was properly instructed on this point. Moreover, we also conclude Stauffer has failed to raise any other appropriate objection to its admission, and thus the evidence was properly admitted. Greer's challenged testimony was as follows:

"Q. ... Did you discuss the case with both the driver, Gary Stauffer, and with the witness, Johnny McIntosh?

A. Yes, I did.

Q. Did either of those witnesses tell you what the speed of the Stauffer vehicle was immediately before the collision?

MR. WYNEKEN: Your Honor, defendant will object to this question. It calls for hearsay. Secondly, it is not established as to when, where and who was present at the time of this conversation.

... [The court overrules the objection after concluding the question was intended merely to lay a foundation.]

A. Yes.

Q. Okay. Do you recall which one of those individuals told you the speed of the Stauffer vehicle immediately before the collision?

A. The witness, Mr. McIntosh.

Q. I see, and what was the speed which Mr. McIntosh related to you as being the speed of the vehicle immediately before the collision.

---

5. In this regard, McIntosh acknowledged on cross-examination having made the earlier written statement.

MR. WYNEKEN: One moment, Detective. Defendant objects on the grounds that the proper foundation for that question has not been laid.

MR. EWING: Your Honor, may we approach the bench on this? (Benchside conference off the record.)

Q. Officer, was the driver, Gary L. Stauffer, present during your conversation with the witness, John McIntosh, at which time Mr. McIntosh told you the speed of the vehicle?

MR. WYNEKEN: If you remember, Officer.

Q. To the best of your memory.

A. I don't remember where Mr. Stauffer was at that time. I don't know if he was able to hear what was said or not, I really don't remember. ... [Outside the presence of the jury, the court and counsel consider whether the line of questioning calls for hearsay, at which time it arguably was objected McIntosh should have been questioned before Greer as part of a "foundation" regarding statements made to Greer. The court concludes the elicited evidence was not offered for the truth of the matter asserted.]

Q. Officer, referring back to the previous question again, I believe that I asked, what is the speed which the witness, John McIntosh, gave you as being the speed of the vehicle driven by Gary L. Stauffer immediately before the accident?

A. He said the speed was in excess of 50 miles an hour."

Although Stauffer variously argues on appeal that such testimony was permitted without proper foundation and in any event was hearsay, the first of these objections is not cogently argued pursuant to Ind.Rules of Procedure, Appellate Rule 8.3(A)(7), while the hearsay objection was clearly misplaced. As the record makes evident in an admonishment by the trial court not quoted above, the jury was instructed before Greer testified that his account of what McIntosh said was "to be considered by you not for the truth of what is said in the statement but only for your consideration in determining the credibility that you will give to the testimony given by the witness, John McIntosh, yesterday." Thus, the testimony was not offered for the truth of what was said. In addition, the court emphasized in its conference with counsel that it was overruling Stauffer's objections pursuant to the reasoning in *Thompson v. State*, (1944) 223 Ind. 39, 41–42, 58 N.E.2d 112, 112–113, and related cases, where it is suggested (in dictum) that once a witness has been impeached on an issue by evidence of statements made out of court, "it appears then to be proper to give the party who called the witness an opportunity to support him, by providing that the witness had, on other occasions, stated the facts as he represents them in his testimony," [6] *quoting Coffin v. Anderson*, (1937) 4 Blackf. 395, 399.

---

**6.** One theory possibly justifying the rehabilitation of a witness under these circumstances is that "it is not a proved fact that the witness uttered a contradiction and the consistency of his statements may help the jury in determining whether he did." *Dagley v. Armstrong Rubber Co.*, (7th Cir. 1965) 344 F.2d 245, 249, *quoting* IV WIGMORE, EVIDENCE § 1126 at 198 (3d ed. 1940). Stauffer does not raise the question, and thus we need not decide, whether such theory has any applicability where the impeachment of a witness is by his own admitted written statement.

It does not appear the majority view permits the rehabilitation of a witness as suggested in *Thompson v. State, supra,* for the reason that " '[t]he witness is discredited by the fact that he has contradicted himself and related the transaction in different ways, and to admit evidence that at some time he had made a statement consistent with his testimony would only show that at different times he had been making different statements about the same matter." *Dagley v. Armstrong Rubber Co., supra* at 249, *quoting* 58 Am.Jur. *Witnesses* § 825 at 462 (1948). Thus, many states permit such rehabilitation only where it is suggested by way of impeachment that the witness has recently fabricated his testimony or has a motive to falsify, as opposed to instances where he has merely made contradictory statements. *Id.* at 249.

In his brief, Stauffer is clearly mistaken in suggesting the only legitimate purpose of introducing Greer's testimony would be to establish that McIntosh had made *a statement* to him regarding the speed of the Stauffer vehicle, and

We note, in this regard, that Stauffer presents no cogent argument supporting his conclusion that under the reasoning of *Thompson*, "only the identification witness herself could testify concerning her prior identification testimony." In *Thompson*, the Court stated merely that "evidence" of such statements could be introduced under appropriate circumstances, *citing, inter alia, Tyrrel v. State*, (1912) 177 Ind. 14, 97 N.E. 14, where a stenographer called as a witness was permitted to testify regarding consistent and inconsistent statements of a prosecution witness made in an earlier proceeding before the mayor of Connersville.[7] *See also Hobbs v. State*, (1892) 133 Ind. 404, 407, 32 N.E. 1019, 1020, where our Supreme Court upheld the trial court's action in "permitting the prosecuting witness *and another* to testify to statements of the prosecuting witness made out of court, in corroboration of his testimony concerning the identity of the defendants." (Emphasis added.) As is stated in M. Seidman, The Law of Evidence in Indiana (1977), "the defense may be intrinsic by showing prior consistent statements through testimony of the impeached witness or extrinsic through the testimony of others." *Id.* at 45. Indeed, we believe that, in general, the testimony of the impeached witness himself as to prior consistent statements is of less probative value, because of its self-serving nature, than the observations of disinterested third parties, a conclusion which has received the support of Wigmore in his treatise on evidence. IV Wigmore, Evidence § 1132 at 295–96 (Chadbourn Revision, 1972).

■ Finally, while he ultimately does not quarrel with the "general expression of a hearsay exception" stated in *Thompson v. State, supra* and *Coffin v. Anderson, supra*, Stauffer does imply in his brief that McIntosh was never "impeached."[8] Once again, it appears such contention has not properly been raised on appeal, since it was not a part of Stauffer's objections during the trial of this cause, nor, for that matter, is the nature of his argument cogently presented in his brief. In any event, however, we believe it is self-evident that proof of prior statements inconsistent with those made in court thus raising a question as to the declarant's credibility, are typically recognized as a common form of impeachment. *See generally*, M. Seidman, The Law of Evidence in Indiana, 33–45 (1977).

■ Similarly, the further contention that it was necessary as part of a foundation to first question McIntosh regarding his statements to Greer, before questioning Greer himself, is without substantial merit. Logic does not dictate that when there are two witnesses to an event which is relevant and material to a law suit for purposes of rehabilitation, the testimony of one such witness is a condition precedent to the other. Indeed, we believe the testimony of the other (here Greer) may be elicited even in the event an initial witness, such as McIntosh, may happen to deny its occurrence. Accordingly, there was no error committed by the trial court in overruling Stauffer's objections to the testimony of Greer.

### III.

We next consider Stauffer's argument the trial court erred in the giving of certain instructions, and in the refusal to give one of the instructions tendered by Stauffer.

---

that Greer should not have been allowed to explain *what speed* McIntosh had stated. Whether the goal of introducing prior consistent statements is to show that McIntosh had not recently fabricated his testimony, or to show that no inconsistent statements were in fact made, it is clear that evidence as to what McIntosh told Greer may be admitted without such evidence being offered for the truth of what was said.

7. In that case, the Court held it was error to admit the consistent statements, but only because the trial court did not restrict the admis-

sion of the prior statements to those which were in harmony with the testimony which had been contradicted.

8. We also note that in his reply brief, however, he appears to abandon such contention, since he there merely argues with respect to evidence of prior consistent statements that "there was no foundation established for it through the witness that was being rehabilitated and because the witness presenting the evidence *was not the witness who had been impeached*." (Emphasis added.)

*Refusal of Stauffer's Instruction No. 5 on Wilful and Wanton Misconduct*

■ Stauffer contends the court erred in refusing to give his Instruction No. 5, which reads:

"To hold defendant guilty of 'wilful' or 'wanton' conduct, the plaintiff must show by a preponderance of the evidence that defendant was conscious of his conduct and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries."

In his brief, Stauffer asserts the refusal of such instruction was error in that no other instruction stated that to show wanton or wilful misconduct "the plaintiff was required to prove the defendant had actual knowledge of existing conditions and with such knowledge he then proceeded to do some wrongful act or omitted some duty which produced the plaintiff's injuries." We disagree. Assuming *arguendo* Stauffer has thus correctly stated the law defining wilful and wanton misconduct, we observe the concepts to which he alludes were expressed in the court's Instruction Nos. 11 and 12. Instruction No. 11 states:

"In order for the conduct of the defendant to constitute willfulness [sic] or wantonness within the meaning of the Indiana Guest Act, *the acts or conduct of the defendant must be done under circumstances which show that he was aware from his knowledge of existing conditions that it is probable that injury would result from his acts and omissions, and nevertheless proceeded with reckless indifference as to the consequences of acts without consideration of others on the highway or without care for their safety.* The distinction between the two terms 'wilful' [sic] and 'wanton' as used in the instructions, is that willful [sic] implies intent or purpose to cause injury while 'wanton' expresses a reckless disregard for the consequences of his act on the part of the defendant.

It is not necessary that the plaintiff prove that the defendant deliberately intended to injure him. *It is sufficient if the plaintiff proves by preponderance of the evidence that the defendant intentionally acted in such a way that the natural and probable consequences of his act was injury to the plaintiff."* (Emphasis added.)

In addition, the court's final Instruction No. 12 informed the jury:

"In determining whether or not the Defendant was guilty of 'wilful' of 'wanton' misconduct you should follow the following guidelines:

1. An error of judgment or a mistake standing alone or failure to exercise reasonable care, on the part of the Defendant, will not amount to wanton or wilful misconduct.

2. The Defendant must have manifested an attitude adverse to the Plaintiff or of 'perverseness', in that the Defendant must have shown he was indifferent to the consequences of his conduct.

3. The entire course of conduct of the Defendant leading up to the accident must be considered.

4. *The Defendant must have had actual knowledge of danger confronting the Plaintiff."* (Emphasis added.)

Stauffer has failed to show any error in the refusal to give his tendered instruction.

*The Giving, As Modified, of Stauffer's Instruction No. 3 on Wilful and Wanton Misconduct*

On this same essential issue of the meaning of wilful and wanton misconduct, Stauffer further alleges it was error for the court to modify his tendered Instruction No. 3, which stated in its original form:

"Wanton or wilful misconduct means *a course of action which shows an actual or deliberate intention to cause injury or;*

A course of action on the part of the Defendant which, under existing conditions, shows either an utter indifference

or conscious disregard for the safety of others." [9] (Emphasis added.)

■ In contrast to this submitted instruction, the one given by the trial court as its Instruction No. 9 omitted the italicized language relating to wilfulness, apparently because the evidence presented did not warrant an inference that Stauffer's actions were "wilful" rather than "wanton." Stauffer contends such final instruction was "incomplete" and misleading. Significantly, however, Stauffer presents no argument there was evidence tending to make wilful misconduct an issue in the instant litigation (nor do we glean any on our review of the record), and thus an incomplete statement of the law on wilful misconduct by virtue of deleting language in an instruction would not serve to prejudice him. In considering whether any error results from the refusal of a tendered instruction, it is incumbent upon the complaining party to show there is evidence in the record to support the giving of the instruction. *See Dahlberg v. Ogle*, (1978) 268 Ind. 30, 40, 373 N.E.2d 159, 164, 165, *citing Davis v. State*, (1976) 265 Ind. 476, 478, 355 N.E.2d 836, 838.

■ In addition, insofar as both "wilful" and "wanton" misconduct are concerned, we believe the court's final Instruction No. 9, particularly when combined with its Instruction No. 11, *infra*, sufficiently identifies the degree and nature of proof required. Pursuant to its Instruction No. 11, that court clearly distinguished between the concepts of wilful and wanton misconduct. As this Court has frequently had occasion to observe, all non-mandatory instructions such as those here at issue must be considered together to determine whether the jury was properly instructed, and "all applicable law need not be included in one instruction." *American Optical Co. v. Weidenhamer*, (1980) Ind.App., 404 N.E.2d 606, 622 (transfer pending). Where it is alleged a court has erred in the giving of its instructions, "[t]his Court presumes the trial court correctly decided questions presented and the appellant has the burden of overcoming this presumption by indicating

how the trial court committed serious error." *Id.* at 624. We do not believe Stauffer has demonstrated there was "serious error" in the modification of its tendered instruction.

Stauffer also objects to the trial court's giving, with various modifications, the instructions tendered by Lothamer on the question of damages. His particular contentions are as follows:

*Final Instruction No. 18*

■ Stauffer maintains that in its Instruction No. 18, the trial court "makes no attempt to distinguish between general and special damages" and that in so doing it is misleading and "permits the jury to determine special damages in this case without proof of the fair value of necessary and reasonable expenses of medical treatment and care . . . ." That Instruction reads:

"In determining the damages which you may award to the plaintiff, you are instructed that the burden is on the plaintiff to prove his damages by a preponderance of the evidence, but he is not required to prove with mathematical precision the exact sum of his damages, but only furnish evidence of sufficient facts and circumstances to permit an intelligent and probable determination thereof."

Stauffer presents no cogent argument pursuant to Ind.Rules of Procedure, A.R. 8.3(A)(7) suggesting why such instruction is erroneous or misleading, but instead cites two authorities suggesting merely that "reasonable and necessary medical expenses . . . are a proper element of damages." *Hickey v. Shoemaker*, (1960) 132 Ind.App. 136, 143, 167 N.E.2d 487, 490. *See also Cooper v. High*, (1974) 262 Ind. 405, 317 N.E.2d 177. At least when read in conjunction with the various other instructions of the trial court, the challenged instruction does not suffer from the alleged defect. Indeed, we note in this regard that the court's Instruction 20, which Stauffer also attacks *infra*, was virtually identical to one employed in *Cooper v. High, supra*, a case

---

**9.** This instruction is the same as Indiana Pattern Jury Instruction 5.71.

relied upon by Stauffer, in that Instruction 20 stated Lothamer may recover for "the *reasonable* expense of necessary medical care, treatment and services and the *reasonable* expense of future medical care, treatment and services," and that the jury "must determine the amount of money which will fairly compensate plaintiff Daniel Lothamer for those elements of damage *which were proven by the evidence* to have resulted from the wanton or wilful misconduct of the defendant Gary Stauffer." (Emphasis added.) If serious error allegedly resulted from the giving of such instructions, then the burden is upon Stauffer to substantiate his claims, and this we conclude he has not done. *American Optical Co. v. Weidenhamer, supra.*

*Final Instruction No. 19*

■ Stauffer further argues that error was committed in the giving of final Instruction No. 19, for the reason "[t]here was no evidence that the plaintiff actually was employed prior to or at the time of the injuries, nor was there any evidence that he could have been so employed." The challenged instruction states:

"In order for the plaintiff to recover for the loss of his time it is not necessary that he have been employed at the time of the collision. Accordingly, I instruct you that if you find for the plaintiff on the question of liability, you may consider the value of any time lost by the plaintiff as a proximate result of the willful [sic] or wanton misconduct of the defendant.

In determining the value of plaintiff's lost time you may consider plaintiff's age, health, training, experience, intelligence, and talents, as well as the nature of his injuries."

Stauffer's argument in this regard misapprehends the law. On its face, the court's final instruction advises the jury with respect to the damages suffered for Lothamer's loss of time resulting from the accident, an element of damages which does not re-

quire that Lothamer was employed when the accident occurred, or even that he necessarily had any definite prospects for employment. *See Rieth-Riley Construction Co., Inc. v. McCarrell,* (1975) 163 Ind.App. 613, 325 N.E.2d 844. As this Court observed in *Rieth-Riley,* "[w]hile loss of earnings is an appropriate element to consider in determining the value of plaintiff's loss of time, it is by no means the exclusive measure," since "it must be emphasized that the compensable element is *time.* . . . It is the *time* which belonged to the plaintiff and which plaintiff's injury has deprived him of that is compensable." *Id.* at 618–19, 325 N.E.2d at 848, *citing* 22 Am. Jur.2d *Damages* §§ 91, 208, 210 (1965). Thus, it has correctly been reasoned that the "[i]nability of plaintiff to follow his ordinary pursuits is a proper element of damages regardless of whether he had actually been receiving compensation therefor." 22 Am.Jur.2d *Damages* § 89 at 131 (1965), although, as with any damage award, evidence must be introduced which removes any award from the area of speculation.[10] *Rieth-Riley Construction Co., Inc. v. McCarrell, supra,* at 620, 325 N.E.2d at 849; 22 Am.Jur.2d *Damages* § 89 *et seq.* (1965).

Moreover, although it is undisputed that Lothamer was not employed when the accident occurred, there was competent evidence that in fact he may have been employable: namely, the testimony of the manager of a plastics corporation to the effect that Lothamer had been sent a written request to come for a job interview, and the fact that 70 percent of the people who receive such requests would be hired by the company. The request was dated June 21, 1974, which was the delay of the auto accident. We conclude error was not committed as alleged in the giving of this instruction.

*Final Instruction No. 20*

■ Stauffer also attacks the giving of Final Instruction No. 20 which reads:

---

**10.** To avoid the possibility of speculative awards, courts appropriately admit evidence of the plaintiff's age, life expectancy, health, training, experience, intelligence and talents. 22 Am.Jur.2d *Damages* § 100 (1965). We note the trial court's instruction properly brought these factors to the attention of the jury.

"If you find for the plaintiff on the question of liability, you then must determine the amount of money which will fairly compensate plaintiff Daniel Lothamer for those elements of damage which were proven by the evidence to have resulted from the wanton or wilful misconduct of the defendant Gary Stauffer. You may consider:

1. the nature and extent of his injuries;

2. whether those injuries are temporary or permanent;

3. the physical pain and mental suffering experienced and reasonably certain to be experienced in the future as a result of the injuries;

4. the value of lost time and loss or impairment of earning capacity;

5. the reasonable expense of necessary medical care, treatment and services;

6. disfigurement or deformity resulting from the injuries;

From a consideration of the elements of damages just enumerated, you are to determine the amount of money which will fairly compensate plaintiff · based upon a consideration of the evidence relating to the damages."

Although he does not quarrel with the general correctness of the instruction given on these various aspects of damages, Stauffer does maintain there was no evidence of impaired earning capacity or disfigurement or deformity resulting from Lothamer's injuries, and thus that it was improper to give parts four and six of this instruction.

In contradiction of such argument, however, we find there was evidence both of impairment of future earning capacity, and of disfigurement or deformity resulting from the accident. Thus, Lothamer, who is a factory worker currently employed as a paint mixer, himself testified that although he is right-handed, he must use his left arm to pick up heavy objects owing to the fracture of his right arm, that his right arm still aches and that it can not be fully unbent or opened, evidence which we believe is relevant to both aspects of the challenged instruction. He stated he has suffered an overall loss of strength and range of motion in the arm. Additionally, one Dr. Bromley testified by deposition that at some point in the future, it would be advisable to remove a compression plate and screws from Lothamer's right arm, a procedure requiring additional surgery and two to three days in the hospital. He also stated the arm "should be protected from strenuous heavy activity for six to eight weeks after the plate and screws are removed." Finally, there also was evidence that as a result of the accident, Lothamer had suffered scarring from his urethra at the site of his injury, and that such scarring would in all probability require future urethral dilations for the rest of Lothamer's life.

*Final Instruction No. 21*

Stauffer's final argument regarding the instructions given to the jury is that the court should not have given its Instruction No. 21, which states:

"According to the United States Life Tables, compiled by the United States Bureau of Census, which is a standard table of mortality, the life expectancy in this country of a white, male person, 25 years old, is 45.65 years.

This fact may be considered by the jury in arriving at the amount of damages to be awarded, if you should find for the plaintiff, Daniel Lothamer, on the question of liability.

Life expectancy as shown by the Mortality Table is merely an estimate of the probable average of the remaining length of life of all white, male persons in the United States of a given age, and that estimate is based upon the limited record of experience. So, the inference which may be reasonably drawn from the life expectancy, as shown by the table, applies only to one who has the average health and exposure to danger of people of that age and sex.

In determining the reasonably certain life expectancy of Daniel Lothamer, you may consider in addition to what is shown by the Mortality Table, all other facts and circumstances and evidence in the case bearing upon his life expectancy,

including his occupation, habits, past health record and his present state of health."

In this regard, Stauffer alludes to numerous alleged errors, but cites authority and cogently argues only two of these issues: 1) that the instruction assumes the truth of material facts in evidence, by allegedly stating it is a "fact" that Lothamer's life expectancy is 45.65 years; and 2) that there is no probative evidence Lothamer has any permanent disability or that he will be unable to engage in his vocation or profession in the future.[11]

■ Initially, we do not believe the given instruction assumes it is a 'fact that Lothamer's life expectancy is 45.65 years, or that it is misleading in this regard. Rather, it is clear, we believe, that when the instruction refers to "[t]his fact," it is alluding to the existence of the United States Life Tables and what those tables show. In addition, the jury was further instructed that such tables are "merely an estimate," and that it may consider other appropriate factors as they bear on Lothamer's probable life expectancy.

The argument that the instant case involves no evidence of future damages or damages of a permanent nature has in essence already been considered herein. As noted above, there was evidence, for example, that Lothamer would require regular urethral dilations for the remainder of his life, evidence of continuing pain and disfunction with respect to his right arm, and evidence which at least would support the inference that further surgery on his arm would be required.

## V.

■ Stauffer next presents two issues regarding the propriety of the jury's verdict rendered against him. First, he

alleges it was not a unanimous verdict because one juror, Kathryn Ann Forker, was allegedly coerced into agreement. In addition, it is also suggested that there was "bailiff misconduct" in the form of a statement to Forker that deliberations must continue until agreement was reached.

Significantly, the only support offered for either of these assertions consists of the deposition of the juror herself, taken by Stauffer over the objections of Lothamer, in the presence of a special judge of the trial court. Since we conclude such practice of impeachment of a verdict by a juror alone is improper, it follows that we need not (and pursuant to the controlling authorities should not) consider the particular allegations of misconduct which purportedly took place.

There is perhaps no rule more firmly established in this state than the one that a verdict may not be impeached by the testimony or affidavit of the jurors who return it. *Bryant v. State*, (1979) Ind., 385 N.E.2d 415; *Henry v. State*, (1978) 269 Ind. 1, 379 N.E.2d 132; *Grigsby v. State*, (1978) 267 Ind. 465, 371 N.E.2d 384; *Stinson v. State*, (1974) 262 Ind. 189, 313 N.E.2d 699; *Wilson v. State*, (1970) 253 Ind. 585, 255 N.E.2d 817; *Widup v. State*, (1967) 250 Ind. 1, 230 N.E.2d 767; *Taylor v. Garnett*, (1887) 110 Ind. 287, 11 N.E. 309; *Hughes v. Listner*, (1864) 23 Ind. 396; *Hardiman v. State*, (1978) Ind.App., 377 N.E.2d 1384; *Estate of Brunson v. White*, (1973) 157 Ind.App. 211, 299 N.E.2d 186; *Laine v. State*, (1972) 154 Ind.App. 81, 289 N.E.2d 141; *Jessop v. Werner Transportation Co.*, (1970) 147 Ind.App. 408, 261 N.E.2d 598. Among these cases, *Laine, Widup* and *Hughes* all involved assertions of misconduct arising from alleged communications of the bailiff, and each held the affidavit or testimony of a juror could not be used to establish the fact of

11. Other contentions which Stauffer boldly asserts without any supporting argument and which we thus do not consider, are that the instruction "does not go into the question of whether or not the plaintiff can recover for the time he will live in his injured condition as opposed to the length of time that he would have lived except for the injury," that "[t]here was no evidence that his life expectancy must be measured from the time of trial as opposed to the time of the injury," that "it is an attempt to instruct the jury on the shortening of life which is contrary to the law of the State of Indiana," and that "it places too much emphasis on the life expectancy element of damages."

the communication. Significantly, although the Court in *Laine* ultimately did find there had been bailiff misconduct based on the bailiff's own affidavit, Judge Sharp there stated:

> "If the contentions of the Appellant were based solely upon the affidavits of the jurors just referred to we would unhesitatingly affirm the conviction in this case.
>
> However, there is more. [The affidavit of the bailiff.]"

*Laine v. State, supra* at 83, 289 N.E.2d at 142. *See also Sparks v. State,* (1972) 154 Ind.App. 691, 290 N.E.2d 793, where the communication between the bailiff and the jury was established by affidavit of the defendant's attorney who overheard the conversation. Of course, the instant litigation involves only the deposition of the juror herself, and thus is distinguishable from *Laine.*

In *Stinson v. State, supra,* our Supreme Court well expressed some of the reasons which give rise to the rule against impeachment of verdicts, as follows:

> "If this Court were to permit individual jurors to make affidavits or give testimony disclosing the manner of deliberation in the jury room and their version of the reasons for rendering a particular verdict, there would be no reasonable end to litigation. Jurors would be harassed by both sides of litigation and find themselves in a contest of affidavits and counter-affidavits and arguments and re-arguments as to why and how a certain verdict was reached. Such an unsettled state of affairs would be a disservice to the parties litigant and an unconscionable burden upon citizens who serve on juries."

*Stinson v. State, supra,* 262 Ind. at 198, 313 N.E.2d at 704.

While Stauffer contends the instant situation falls outside the scope of policies expressed in cases such as *Stinson* for the reason that Forker approached Stauffer's counsel on her own initiative without prompting by either party to the litigation, we observe that at most, such argument would address only one of the bases underlying the traditional rule on impeachment. Thus, even assuming *arguendo* jurors would not be "harassed" if this Court were to recognize a limited exception to the rule where impeaching testimony is volunteered by the juror himself,[12] such practice may nevertheless create a situation where " 'no jury verdict would ever be lasting or conclusive.' " *Jessop v. Werner Transportation Co., supra,* 147 Ind.App. at 413, 261 N.E.2d at 601, *quoting Wilson v. State, supra* at 255 N.E.2d at 821. We would not choose to create such a situation.

Nor, for that matter do we find any merit in the admittedly novel attempt to distinguish the instant case by the self-serving assertion that since Forker, allegedly only "reluctantly" agreed with the verdict, her later deposition was not an effort to impeach it. Such argument requires this Court to examine and accept as true the contents of the very deposition which has been challenged, and presumably a similar contention could be advanced in virtually any case where an affidavit or deposition is filed by a juror alleging some impropriety in the decisionmaking process. It is apparent such an exception would easily overwhelm the rule. Accordingly, we find no reason not to apply the long-standing law in this area and conclude the jury's verdict is not invalid as alleged.

## VI.

■ The final argument advanced by Stauffer is that the damage award is exces-

---

**12.** In this regard, we also observe that at least one case involving the long-standing rule against impeachment presented a situation in which "[a]ppellants attached an affidavit to their joint motion to correct errors in which their counsel related being approached after trial by two jurors who described the manner in which the jury arrived at the sentences im-

posed." *Henry v. State, supra,* 269 Ind. at 14, 379 N.E.2d at 139. The Court concluded "the use of the jurors' testimony, first or second hand, to demonstrate improprieties in the method by which the jury reached its verdict constitutes impeachment of that verdict by the jurors, which is not permitted." *Id.*

sive in light of the evidence presented. In particular, he contends the evidence of Stauffer's special damages for medical care and anticipated lost wages amounted to only about $13,300, and thus the jury improperly awarded over $45,000 of its $59,000 total verdict for Lothamer's pain and suffering.

Initially, we again observe that Stauffer is incorrect in his assertion "there is no evidence of probative value that the plaintiff will be impaired or have difficulty physically in the future, . . . ." Lothamer testified as to pain and difficulty using his right arm, and there was expert evidence to the effect that he would require regular urethral dilations for the rest of his life. In addition, we find the evidence relating to Lothamer's pain and suffering was sufficient to support a significant damage award. As Stauffer himself concedes, such pain was at times "substantial" and included not only the suffering which Lothamer experienced immediately following the accident itself, but also his pain and discomfort during a recuperation lasting at least from June 21, 1974, to February 29, 1975, a period of some eight months. Based upon all of the evidence presented, we find the jury's award in the instant case to have been no more unreasonable than that in *American Optical Co. v. Weidenhamer, supra,* (and numerous other cases cited therein comparing verdicts with actual damages proven) where $57,724.45 was awarded despite medical and hospital expenses of only $7,724.51, in which case the Court concluded the total amount "was not an unreasonable award and certainly not so outrageous as to indicate the jury was motivated by passion, prejudice, partiality or consideration of improper elements." *American Optical Co. v. Weidenhamer, supra* at 628.

The judgment of the trial court is affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.